IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 7, 2017

**STATE OF TENNESSEE v. BENJAMIN GUNN**

**Appeal from the Criminal Court for Shelby County**
**No. 09-02072       W. Mark Ward, Judge**

_____

**No. W2016-00338-CCA-R3-CD**

_____

Defendant, Benjamin Gunn, was convicted of unlawful possession of cocaine with intent to sell, unlawful possession of cocaine with intent to deliver, and third offense unlawful possession of marijuana. The trial court merged the two cocaine convictions and imposed a sentence of twelve years. Defendant was sentenced to two years for possession of marijuana to be served consecutively to the possession of cocaine conviction for an effective fourteen-year sentence. On appeal, Defendant raises the following issues: (1) whether the evidence was sufficient to support his convictions for unlawful possession of cocaine with intent to sell and unlawful possession of cocaine with intent to deliver; (2) whether the trial court erred by allowing testimony concerning prior search warrants; (3) whether Defendant was properly sentenced for third offense possession of marijuana; (4) whether the trial court erred by allowing the State's expert witness to testify concerning the characteristics of a drug dealer; (5) whether the State committed prosecutorial misconduct; (6) whether the trial court improperly commented on the legality of the search warrant; and (7) cumulative error. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Gregory D. Allen, Memphis, Tennessee, for the appellant, Benjamin Gunn.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Amy P. Weirich, District Attorney General; and Meghan Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Procedural Background*

In his first trial concerning these charges, Defendant was convicted of possession of more than .5 grams of cocaine with intent to sell, possession of more than .5 grams of cocaine with intent to deliver, and felony possession of marijuana. This court reversed the judgments of the trial court on appeal and remanded the case for a new trial because the trial court erroneously allowed into evidence prior searches of Defendant's residence by law enforcement officers. *State v. Benjamin Gunn*, No. 2013-0206-CCA-R3-CD 2015, WL 847431 (Tenn. Crim. App. Jan. 30, 2015).

*Background*

Officer Kittrel Robinson of the Memphis Police Department testified that in 2007-2008 he was assigned to the Organized Crime Unit, Narcotics Division. He said: "Our assignments over there were to infiltrate, get information on drug houses, drug rings, any type of organized crime, that was our job to pretty much infiltrate, get information and then bring those people to justice." Officer Robinson said that in 2008 he was assigned to "Team 7" whose responsibility it was to target "street level" drug sales in Shelby County. He explained that street level drugs sales "are basically person A, person B selling drugs out of a house[.]"

Officer Robinson testified that on February 29, 2008, he and Team 7 executed a search warrant at Defendant's residence located at 1432 May Street. Officer Robinson had been to the residence within five days prior to the search warrant. Concerning the "traffic" going in and out of Defendant's residence, Officer Robinson testified:

> This is a neighborhood that's the way it is designed is that houses are set up on the east side of the street, so the west side of the street it's no, it's no houses on that side. It's kind of like a what you call a bayou or ditch or kind of sitting like that, so it's only houses on one side.
>
> From my surveillance and day-to-day activity over there most of the houses are older people. And that that meant for me as a narcotics officer is older people don't usually have a lot of traffic coming in and out the house, they kind of lock up, 6:00 they're in, door locked, lights off.
>
> This particular house that I received the information on that I was collaborating [sic] was the total opposite. Lights on, people in and out of the house all day. Gentlemen would pull up in the driveway, meet the gentleman known to me to be [Defendant] in the driveway, talk maybe

thirty seconds, go inside stay thirty seconds to a minute, come back out, get in the car and leave. And from my trained experience that's known to me to be hand-to-hand drug transactions from his house.

Officer Robinson testified that Team 7 consisted of 11 officers both male and female, and they took six unmarked patrol cars and two marked patrol cars to execute the search warrant at Defendant's residence. Officer Robinson testified that each officer had various assignments for entering Defendant's house and executing the search. Officer Robinson was assigned to be the "shield man." This meant that he would be one of the first officers to the door, and he carried a big Plexiglas shield, and the other officers lined up behind him. Officer Robinson testified that they approached the door to Defendant's residence, knocked on it, and announced "Memphis Police" and "search warrant." He noted that the "storm door" to the residence was locked, and the inner wooden door was open. Even though there were bars on the storm door, Officer Robinson could see directly inside the residence, and he saw Defendant jump up from the couch. He said:

> After he jumped up he looked at us at the door and then he started to proceed to come out of the living room and run. So I then yelled to my team, since we [were] so close, runner, runner, so that's where the ram man then comes up and he hits the ram with the pick. So basically it pushes into the groove of a door and now all he has to do was push and we get leverage and the door pops open.

Once they were inside the house, Officer Robinson saw Defendant run and throw what appeared to be cocaine out of a clear bag. Officer Robinson pursued Defendant to the back of the house, and Defendant dove onto a bed in one of the bedrooms. He said:

> So now I'm throwing the shield as he's diving to catch him while he's on the bed because now is my only chance because he's going on the bed but he's going toward the edge where the bed pushes up to the wall. So then I kind of dive on top of him and that's when he was trying to get what we retrieved from him was a bag of cocaine then.

Defendant was then handcuffed and taken into the living room to sit down. Officer Robinson testified that because he was the case officer, he was also the custodian of any evidence taken from Defendant's residence. Concerning drugs found in the house, Officer Robinson testified:

> We were able to backtrack and pick up the crumb that led right back to the bedroom and the crack - - well, the powder cocaine was retrieved from his right hand, so it was right there toward the edge of the bed where he was trying to get rid of that. And I remember another officer

calling my name saying that he found something on the living room table.

Officer Robinson testified that marijuana was found on the table. He noted that the crack cocaine was wrapped in aluminum foil. Officer Robinson testified that the drugs found at the scene were field-tested and later taken to the property room where they were tested and weighed by the custodian of the property room. Officer Robinson testified that he personally observed the testing. He said: "So we have positive for crack cocaine weighing 8.7 grams. Positive for cocaine weighing 1.8 grams. Positive for marijuana weighing 8.5 grams. . ."

Officer Robinson was asked by the State if there had been anyone else at the residence on May Street when the search warrant was executed. The following exchange took place between Officer Robinson and the prosecutor:

A. You know what, I want to say it was but I remember more of [Defendant] because that's who my search warrant was on, that was my target. So it could have been, so other officers could of [sic] completed that arrest ticket, something like that. If I can reflect back to the case that would help me out on the arrest ticket or anything like that.

Q. Well, I'm happy to pass back the arrest ticket. Would it - - you said the - - would the case report help refresh your recollection?

A. Yes. Ma'am.

Q. Now you had said that you more remember [Defendant], why is that, what is that you remember [Defendant]?

A. This is not our first encounter on a - -

Q. And I'm just going to stop you right there.

A. Okay.

Q. If I ask you if Forrest Jones was on the scene that day would that sound familiar to you?

A. Yes, ma'am.

Q. And what about Kimberly Clark?

- 4 -

A. Yes, ma'am.

Q. If Forrest Jones was given a citation would that sound right to you?

A. Yes, ma'am.

Officer Robinson testified that the police report indicated that Mr. Jones was located in the kitchen, and he had a small package of aluminum foil with one rock of crack cocaine, and there was a crack pipe in his front left pocket. Mr. Jones was issued a citation. Officer Robinson said that to his knowledge, neither Mr. Jones nor Ms. Clark lived at the residence. Defendant lived there.

Defendant, acting *pro se*, questioned Officer Robinson on cross-examination. Officer Robinson testified that he worked with a confidential informant in Defendant's case but he did not bring the informant to trial. He agreed that confidential informants give tips on "drug buys and stuff," and the confidential informant in Defendant's case gave Officer Robinson a tip about Defendant. Officer Robinson testified that he had received the tip from the informant within five days of executing the search warrant. He made sure that all of the information from the informant was verified before the search warrant was executed. Defendant asked Officer Robinson several detailed questions about how and when the search warrant was obtained. The trial court intervened and said, "I've already ruled the warrant, the warrant that was actually involved in this case I have ruled was legal. So your questions about this warrant are over with. Move on to another topic." Officer Robinson testified that he did not have any audio or video of drug transactions at Defendant's house.

Defendant asked Officer Robinson if he did a criminal background check on Defendant. The following exchange then took place:

Q. Don't have the witness, don't have the audio and video. You did a background check on [Defendant]; right?

A. Uh-huh

Q. Okay. What did you find out about [Defendant] in the background check?

[PROSECUTOR]: Judge, may we approach?

THE COURT: Sure.

\* \* \*

[PROSECUTOR]: I'm happy for him to answer that question.

THE COURT:    All right, go ahead.

[PROSECUTOR]: Okay.

THE COURT:    He can go ahead and ask him.  You can ask him the question.

[PROSECUTOR]: I don't think he wants him to.

      *      *      *

Q.    (BY [DEFENDANT]) What did you find out in your background check on [Defendant]?

A.    That we have previously did [sic] a search warrant at your house, [Defendant].  Your ties to the house as far as you being there and me seeing you come in and out of the location with a key, being there at different times of the day.

On redirect examination, the following exchange took place between Officer Robinson and the prosecutor:

Q.    So you got a tip from [a] confidential informant and instead of acting on that tip you went and double checked it?

A.    Yes, ma'am.

Q.    And you said in your testimony you had actually executed a search warrant at [Defendant's] house before?

A.    Yes, ma'am.

Q.    So, so this wasn't the first time you had gotten such a tip?

A.    No, ma'am, it a - - no, he wasn't new to me and the operation wasn't new to me also.  I just like to verify the information that I'm given.

On recross-examination, Defendant asked Officer Robinson additional questions about a previous search warrant:

Q.     You said that you were, you were familiar with [Defendant]?

A.     Yes, sir.

Q.     Through a previous case?

A.     Yes, sir.

Q.     On that previous case did you have a search warrant then?

A.     Yes, sir.

Q.     Was [Defendant] named on the search warrant?

A.     No, sir.

Q.     So your information, your previous involvement really didn't involve [Defendant], did it?

A.     Yes, sir, it did.

Q.     It did?

A.     Yes, sir.  On the previous search warrant at your house, if I can remember right, when we came into the house you then had hands on drugs at that time also.

Officer Star Handley of the Memphis Police Department testified that in 2007-2008, he was assigned to the "Organized Crime Unit Drug Response Team 7" of the police department.  Officer Handley participated in the execution of the search warrant at Defendant's residence on February 29, 2008.  He said, "I was a member of the raid/entry team and my job was the breacher of the door, also know[n] as the ram man."   Officer Handley testified that he was the last officer to enter the residence; therefore, he did not see Defendant until Defendant was handcuffed and brought from another part of the residence.  Officer Handley participated in the search and located a bag of marijuana on a table in the living room.  He was present when the marijuana was field tested, which tested positive for THC, and he said that it weighed a total of 8.5 grams.

On cross-examination, Officer Handley testified that he remembered Defendant and a female being present in the house at the time of the search.  He did not recall if Forrest Jones was also there.

Officer Michael Gibbs of the Memphis Police Department was recognized by the trial court as an expert in the field of street-level drug sales in Memphis due to his work as a "deep undercover" agent for two and a half years "both buying and selling on the streets of Memphis[.]" Defendant stipulated to Officer Gibbs being declared an expert.

Officer Gibbs viewed the drugs at trial that were seized from Defendant's house, and he said: "One hundred percent that they are packaged to sell." He further explained:

> Because, as I said before, the quantity by themselves, I mean, there are drugs users don't carry this amount of drugs on them. They are buying the drugs to use immediately. They don't - - as drugs users and if they'd been caught with a million rocks on them and they don't use - - they're trying to chase a high that they can't - - that they achieved the first time they can't reach again. So they are always constantly - - it's like an itch that you can't scratch. They're always smoking, smoking.
>
> This is no way that a normal user would possess this much because they are in the habit of just smoking it up. They don't save and invest and say I'm going to save and open a saving account and I'm going to go get a little bit of crack here and there.

Officer Gibbs also noted that only a seller of crack cocaine would have the quantity of rocks that were found in Defendant's possession. When asked what "packaged for resale" meant, Officer Gibbs testified:

> It means that they're in - - they're individually wrapped. Each one of these if, say a user, if I'm going - - I'm going to buy dope, I'm not going to buy, I'm going to get what I can afford at that time.
>
> And sellers are different. If I'm a seller and I'm going to buy dope, I don't want all of these individually wrapped because that adds weight on to my total. I'm going there to purchase a certain amount of drugs that weigh that so much. And trust me, sellers are very accurate on their weight. If they're - - this aluminum foil wrapped around each piece adds weight on to those pieces which mean that I'm buying foil, not drugs. As a seller that's no good to me.
>
> If I'm selling each one of these pieces, which are relatively large pieces at that, then I make more money. I can buy this amount in one solid piece and break it up and make twice, the three, four times as much as I would of made or as I would of made selling it as one rock.

Officer Gibbs estimated that there were "[a]nywhere between forty and fifty rocks" of crack cocaine, including the "crumbs," in the package recovered from Defendant's residence. He weighed a couple of the rocks of crack cocaine in front of the jury and testified as to the street value of the cocaine recovered from Defendant's residence. He testified that Defendant could have made "like three thousand dollars off of it." Officer Gibbs noted that because Defendant had powder cocaine, crack cocaine, and marijuana in his house that Defendant was probably "selling to different people, different clientele." He said, "Somebody might come to his location to buy weed. Somebody might come to his location to buy powder. Somebody might be coming to buy crack."

Concerning the appearance of crack cocaine users and drug dealers, Officer Gibbs testified:

> You would see they - - the pipes get really hot. You'd see what we call the ring from the glass or metal pipe. You can't smoke it in plastic because you can't get it hot enough, well the plastic starts to melt so that's why they use glass pipes and or metal pipes. They put Chore Boy in the end of it and they smoke and get a burn sometimes on their fingers, severe burns on their fingers and they get a, if their lips touch the pipe, they'll get a U shape.
>
> Crack users also it, as I say, it looks as if their losing like weight. Those guys who are addicted to crack they start to change physical appearances. You start to look like you're getting older and you could be, you know, a younger guy. It takes, it takes away your youth. It takes away your vitality.
>
> *     *     *
>
> Drug dealers, I mean, they come in all shapes and sizes. We've had an older lady who could have been my grandmother selling this stuff. But they tend to be normal looking people. Healthier people. They don't have the char - - they don't have, like I said, the crack, the burnt lips, the fingers from where they've been holding the pipes. So they more blend in with us or people who aren't on or addicted to crack.

When asked if Defendant displayed any of the characteristics of a crack cocaine user, Officer Gibbs replied: "He looks healthy to me." The State again asked Officer Gibbs about the drugs found in Defendant house, and Officer Gibbs testified: "This is packaged to sell. This is not a user. This many rocks and as big as it, this is a seller." He further said: "I know one hundred percent [Defendant is] selling dope."

Special Agent Shalandus Garrett is a forensic scientist with the Tennessee Bureau of Investigation (TBI) Crime Lab in Memphis. She tested the drugs in the present case. The clear plastic bag of powder tested positive for cocaine and weighed 1.34 grams. She tested one of the rocks which also tested positive for cocaine base and weighed 0.15 grams. A second rock tested positive for cocaine base and weighed 0.24 grams. Special Agent Garrett testified that the remaining individually wrapped rocks of cocaine were not tested and that their gross weight was 9.16 grams. She noted that the rocks appeared to be cocaine base and were consistent with the rocks that she tested. Special Agent Garrett testified that she tested the plant material, and it was positive for marijuana. The weight of the plant material was 7.12 grams.

Defendant testified that he remembered there being six people, including himself, at his house when the search warrant was executed. He said that two people received citations, and three people, including himself, were handcuffed. Defendant testified that Kimberly Clark and "Mr. Forrest" were supposed to receive citations, and "the young guy Big Dude they let him go." Defendant did not call any of the individuals to testify at trial because two of them had died, and other people had moved away. Concerning the storm door at his house, Defendant testified:

> Well, my storm door had dark tint, you couldn't see in. And it didn't have the bars that they claim that I had there. And I have pictures of my door, of my storm door and I would like to show it. But I tried to show it at the las - - oh, I'm sorry, I can't bring that up, one up. I'd like to show the picture to the jury, if I might, about the storm door.

On cross-examination, Defendant admitted that the picture of his door showed "partial bars." He also noted that there was newspaper in the top part of the door. Defendant testified that the picture of his door was taken after the search warrant had been executed. However, he said that the door looked the same in the picture as it did on February 29, 2008. Defendant admitted that the marijuana belonged to him but he said that he did not have a bag of powder cocaine in his hand. He did not know where the crack cocaine was found. Defendant testified that he did not see members of the Memphis Police Department come into the house because he was in the bedroom lying down at the time. He also denied throwing any rocks of cocaine, and he never saw a copy of the search warrant. Defendant said that he had been smoking marijuana before police arrived.

Defendant testified that there were people at his house "constantly" and that he entertained them by partying. He said: "Well, people will be sitting around sometime and we would drink coffee and sometimes we would drink a little alcohol. Sometimes we would smoke marijuana." Defendant testified that people had smoked crack at his house, and he said that he had not smoked crack since 1985. He admitted that he had possessed crack cocaine since 1985 because he purchased it for someone else. Defendant

- 10 -

did not know why cocaine was in his house on February 29, 2008. The State then asked to approach the bench, and a conference was held out of the hearing of the jury. The prosecutor told the trial court: "I think he's pretty much kicked the door wide open for me to talk about some of the other incidents." The jury was sent out, and the following exchange took place:

[PROSECUTOR]: Judge, I want to talk about the August 1st and the August 19 incidents where [Defendant] was found with crack cocaine. He said he hasn't had it since 1985. And he was found on two separate occasions and I would like to ask him about it.

THE COURT: And the day of this incident, remind me.

[PROSECUTOR]: It was February 29, 2008.

THE COURT: And these happened August 1st.

[PROSECUTOR]: August 1st and August 19th of 2007, in the same house, on the same street.

THE COURT: She wants to ask you about that, what's your take on that, [Defendant]?

[DEFENDANT]: She asked me had I smoked crack.

THE COURT: No, what - - she's wanting to introduce those, talk to you about those matters in front of the jury, is that okay with you or do you object to her?

[DEFENDANT]: I object to it. But I want to say this, though, your Honor, she asked me had I smoked - - the last time I smoked and I said 1985. That's what she asked me.

THE COURT: All right. Well, here's - - I'm going to let her ask. I think the door had been opened about this for multiple reasons. One thing, during the testimony of a prior witness, let's see, that was Kittrel Robinson, during the testimony of Kittrel Robinson, Mr. Jones (sic), you asked and elicited that he had previously done a search warrant at your house. And you also elicited from him that in a previous case you had drugs in your hands. All of which if you'd of had a lawyer may not of ever gotten in but you weren't smart enough to keep that part out. So you've already opened the door and now you claim that you - -

[DEFENDANT]:   May I say something about that, your Honor?

THE COURT:      No, not until I'm finished making my ruling and then I'll let you talk.  But then here on cross-examination by the State, she's now claiming in addition to that that you've opened the door by your claims with regard to not having any cocaine in your possession for a number of years.  And then you generally denied that you had any knowledge that this cocaine was in your house.  You don't contest that cocaine was in your house?

[DEFENDANT]:   No, sir, I never - -

THE COURT:      But you're just claiming it's none of mine.  I don't - -

[DEFENDANT]:   It's not mine.

THE COURT:      I don't have any kno - - I wasn't in on it.  I don't have any guilty knowledge of it.  You didn't even know it was there, did you?

[DEFENDANT]:   Well, I probably knew it was there so.

THE COURT:      Okay.  Well then she'll ask you that when the jury comes back.  But are you going to ask me to introduce 404(b) proof of this?  Or just want to ask him about it?

[PROSECUTOR]: I just want to ask him about it.

THE COURT:      Well what - - of, go ahead.

[PROSECUTOR]: I just want to ask him about it right now, judge.

THE COURT:      Go ahead.

[PROSECUTOR]: After he's done testifying I may speak with Detective Robinson and put in the 404(b) proof.  But right now I just want to ask him about it.

THE COURT:      Well unless I know - - I believe he's opened the door but I also want to in my mind feel confident that if you wanted to put proof of substantively about this that it would qualify under 404(b).  Now looking at this objectively under 404(b) we're talking about the evidence that within, what, six months, how many months was it?

[PROSECUTOR]: August to February, so roughly six months.

THE COURT: About six months. Within six months twice this house, which I think based upon your expert's testimony could pretty much be described as, what, a trap house?

[PROSECUTOR]: A trap house, yes.

THE COURT: You know, within months [Defendant] is physically present when they have all this cocaine around. And in one of the incidents he's flushing the cocaine down the toilet which, and by the way, he's been convicted of that. So talking about clear and convincing evidence.

[PROSECUTOR]: Judge, he's been convicted of the August 17th matter too, he plead guilty.

THE COURT: So he's been actually convicted of the August 1st and the August 17th, so that's clear and convincing evidence.

[PROSECUTOR]: He actually plead guilty to possession of cocaine which is direct, directly controverts what he's testified to today.

THE COURT: Yeah. Well, so, again, does - - is this relevant to something other than propensity and of course I think it would be relevant evidence as to his intent. I think it's relevant to his guilty knowledge. I think it's relative to his knowledge intent. I mean you can't operate a trap house and then say all this stuff, I had no clue that these drugs are in my house. And so I think it relates to all of that.

I think this is significantly different than when this case previously went to the Court of Criminal Appeals because I - - for two reasons. I have not ruled prior to his testimony that this stuff comes in under 404(b). I gave him a chance to raise all of these issues in his testimony.

It's also significantly different because in the direct examinat[ion] - - I mean his cross-examination he opened [the door] to some of this stuff. So when you weigh probative value versus prejudicial effect, the jury kind of knows about this prior incident already, so that comes into play.

So I think looking at this under 404(b) that before I would allow any substantive evidence of this I would have to have a jury-out hearing, I'd

- 13 -

have to find the evidence relevant to [a] material issue other than propensity and I've stated that those material issues are that I find evidence other than propensity. Must exclude evidence if the probative value is outweighed by the danger of unfair prejudice. And I have to find clear and convincing evidence.

I heard this proof in the prior trial and found clear and convincing evidence. He's since been convicted of both of these incidents which makes it clear and convincing evidence. And I only exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. And since he's opened the door to this and now has put his intent and knowledge and all this stuff in issue for the first time, I think that substantive evidence under 404(b) would be admissible and that this is distinctly different from what procedurally [ ] went up to the Court of Criminal Appeals before.

I will say this, that in the prior opinion of the Court of Criminal Appeals they quoted me in reversing me but didn't quote my entire paragraph. I said in with regard to intent that normally you don't just let in intent unless there's some prior similar connection. And I think that the same house here is involved in a relatively short period of time. This is sort of like the - - so I find connectedness here that makes this different from the normal case.

In the prior opinion in the Court of Criminal Appeals didn't think much of my connectedness analysis but this is somewhat like in the domestic violence incident. Prior crimes of acts of violence against the same victim are admissible sometimes under 404(b), when if they were different victims it wouldn't .

So this is the same house. It's the same deal, so. With it being in this procedural different context with him having elicited this himself in part of his proof and with me not ruling prior to his testimony that this comes in but letting him put all these issues that I find it relevant an issue, first. I think that you could under 404(b) introduce this stuff.

So I'm not saying you're making that decision but before I allow cross-examination on any of this I just wanted to be sure in my mind that the substantive proof to back it up but [sic] also it be available. So I'm going to let you question him about - -

*     *     *

- 14 -

- - those in the presence of the jury. We'll bring the jury back in.

The State resumed questioning, and Defendant reiterated that he had not smoked crack cocaine since 1985. He said that he had purchased crack cocaine for others and gave it to them if they "gave me the money." Defendant said that he did not keep the crack cocaine in his house. He also said that cocaine might be found in his house "if somebody brought it in." Defendant testified that he had a lot of friends who came to his house. He said that some of them "probably" smoked crack cocaine.

Defendant testified that a search warrant was executed at his house on August 1, 2007. He and Furnell Smith were there at the time. Defendant denied that police saw him with a "golf ball size" rock of crack cocaine. He admitted to being found guilty of tampering with the rock of crack cocaine but denied that he was trying to flush down the toilet when police came inside the house. Defendant did not know if his attorney conceded to that fact at trial. Defendant also recalled that the police came to his house again on August 19, 2007, to do a "knock and talk." He was unaware the police found rocks of crack cocaine concealed in a "false bottom can" in his bedroom or "rocking tubes," which are used in making crack cocaine. Defendant testified that the officers found marijuana on the front porch, and they "stepped on it." Defendant testified that he was unaware that officers found a crack pipe under his bed on February 29, 2008. However, he admitted that in his previous testimony in May 2013, he said that the officer made a "deal" about Defendant having a crack pipe underneath the bed where he was laying. Defendant again stated that he did not smoke crack cocaine, sell crack cocaine, or sell powder cocaine. He said that he smoked marijuana and sometimes he gave it away.

Defendant testified that he was not the only person living at 1432 May Street and that he let people come in and out of the residence. He said that people sometimes came there to "party." Defendant agreed that he pled guilty in September 2007 to simple possession of cocaine on August 19, 2007. Concerning his reason for pleading guilty, Defendant testified:

> They arrested two other people. They arrested my girlfriend and another guy and they were in jail with me for a long time and they made me a deal. Mr. Mitchell was my attorney and they made me a deal that if I plead to it they would let them go and I would only be in jail for about forty-five days. And they gave me thirty-nine days credit and that means I would only be in jail six more days. And I would also let the other two people go. And I plead to it just to let them out of jail.

On cross-examination, Defendant testified that he never saw the cocaine that was found by police during the search of his residence on February 29, 2008. He also said that the officers never showed the search warrant to him until he was released from jail. Defendant testified that he never knew that the cocaine was in his house.

- 15 -

*Analysis*

## I. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his convictions for possession of more than .5 grams of cocaine with intent to sell and possession of more than .5 grams of cocaine with intent to deliver. He does not challenge his conviction for unlawful possession of marijuana and concedes that he had possession of the drug.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To sustain a conviction for possession with intent to sell or deliver 0.5 grams or more of cocaine the State must prove beyond a reasonable doubt that appellant knowingly "[p]ossess[ed] a controlled substance with intent to manufacture, deliver or

sell the controlled substance." Tenn. Code Ann. § 39-17-417(a)(4). In that regard, possession of cocaine "is a Class B felony if the amount involved is point five (.5) grams or more." Tenn. Code Ann. § 39-17-417(c)(1). Possession of a controlled substance may be actual or constructive. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). A person constructively possesses a drug when the person has both the power and intention to exercise dominion and control over the drugs either directly or indirectly through others. *See State v. Patterson*, 966 S.W.2d 435, 444-45 (Tenn. Crim. App. 1997). "One's mere presence in an area where drugs are discovered, or one's mere association with a person who is in possession of drugs, is not alone sufficient to support a finding of constructive possession." *Shaw*, 37 S.W.3d at 903. "Proof that a possession is knowing will usually depend on inference and circumstantial evidence." *State v. Brown*, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995) (internal citations omitted) (citing *United. States v. Pierre*, 932 F.2d 377, 392 (5th Cir. 1991)).

Viewing the evidence in a light most favorable to the State, the proof shows that a search warrant was executed at Defendant's residence on February 29, 2008. Officer Robinson testified that when he and other officers approached the residence, he could see into the house through the storm door. When the officers knocked on the door and announced their presence, Officer Robinson saw Defendant jump up from the couch. Once inside the residence, Officer Robinson saw Defendant running out of the living room and throwing what appeared to be crack cocaine rocks out of a clear bag that was in his hand. He pursued Defendant to a bedroom, and Defendant dove onto a bed. Defendant was "going toward the edge where the bed pushes up to the wall." Officer Robinson dove on top of Defendant and retrieved a bag of powder cocaine from Defendant's right hand. The drugs were later tested and were positive for cocaine. There were 8.7 grams of crack cocaine and 1.8 grams of powder cocaine recovered from the residence. The rocks of crack cocaine were individually wrapped in aluminum foil. Officer Michael Gibbs was recognized as an expert in the field of street-level drug sales in Memphis. He testified that the drugs seized from Defendant's house were "[o]ne hundred percent . . . packaged to sell." The quantity was also greater than what a typical drug user would carry. Concerning the drugs, Officer Gibbs specifically stated: "This is not a user. This many rocks and as big as it is, this is a seller." He further said, "I know one hundred percent [Defendant is] selling dope."

We conclude that the evidence is sufficient to support Defendant's convictions for possession of more than .5 grams of cocaine with intent to sell and possession of more than .5 grams of cocaine with intent to deliver. Defendant is not entitled to relief on this issue.

## II.    Testimony Concerning Prior Search Warrants

Defendant contends that the "trial court committed reversible error, and directly ran afoul with this Court's order on direct appeal [from a prior trial], when it allowed testimony regarding prior search warrants in the State's case-in-chief."

On direct appeal from Defendant's first trial in this matter, this Court reversed Defendant's convictions and remanded the case for a new trial. In particular, this Court held:

> Here, the trial court ruled that evidence of the August 1 and 19 searches was admissible prior to the presentation of any proof based primarily on Defendant's unwillingness to stipulate an element of the offense. As alluded to above, until a material issue is created by the evidence presented at trial, evidence of prior bad acts is generally not admissible. We note that the State's first witness at trial, Detective Robinson, first testified about the details of the August 1, 2007 search prior to providing any details of the search on February 29, 2008, which led to the charges for which Defendant was on trial. At this juncture of the trial, no "material issue" as contemplated by 404(b) existed.
>
> Furthermore, the evidence of the prior searches of Defendant's home fails part 4 of the 404(b) test. Under the circumstances in this case, we believe that the probative value of the evidence is outweighed by its unfair prejudicial effect, primarily because the offenses are so closely related. During the 404(b) hearing, the State, arguing in favor of the probative value of the evidence, stated that the prior searches and the search leading to Defendant's charges in this case were "glaringly similar." We believe that because evidence of the prior searches was presented first by the State at trial, Defendant was unfairly prejudiced. We have come to the conclusion, therefore, that evidence of the prior searches is not admissible on retrial unless the trial court determines, at the conclusion of any proof presented by Defendant (and not pre-trial), that the State can meet its heavy burden in this case showing that the probative value of evidence of the prior searches is not outweighed by the danger of unfair prejudice.
>
> We further conclude that the trial court's pre-trial ruling which granted the State's request to be allowed to make a preemptive strike against Defendant with evidence of prior bad acts likely forced Defendant to testify. A defendant in some circumstances by testimony can open a door to allow prior crimes evidence that otherwise would be inadmissible. However, a defendant never opens that door based on

- 18 -

proof he or she offered in a prior trial, or by refusing to stipulate proof establishing beyond a reasonable doubt an element of the crime charged.

Therefore, we conclude that the trial court abused its discretion by allowing evidence of the prior searches of Defendant's residence. Moreover, we conclude that the error was not harmless and more probably than not affected the outcome of the trial. *See* Tenn. R. App. P. 36(b); *State v. Luellen*, 867 S.W.2d 736, 741 (Tenn. Crim. App. 1992). Accordingly, the judgments of the trial court are reversed, and this case is remanded for a new trial.

*State v. Benjamin Gunn*, No. W2013-02006-CCA-R3-CD, 2015 WL 847431, at *4-5 (Tenn. Crim. App. Jan. 30, 2015).

In his brief, Defendant complains of the following instances, during the State's case-in-chief, in which prior searches at Defendant's house were mentioned. We quote directly from Defendant's appellate brief:

1. The first instance occurred on direct examination, prior to any defense cross-examination of any witness. The prosecutor asked "you had said that you more remember [Defendant], why is that, why is [it] that you remember [Defendant]?" (Vol. V, p. 174, lines 12-13). Defendant submits that given this case's history, the Court should have issued a curative instruction and warned the prosecutor to stay away from this line of questioning. No such instruction or warning was issued.

2. The second instance occurred during cross-examination of Detective Robinson and upon questioning by the Appellant. Appellant submits that despite asking the question regarding [Defendant's] own background, the Court failed to conduct the proper 404(b) hearing and the State failed to address the trial court regarding this Court's explicitly clear and obvious ruling. (Vol. V, pp. 187-89). Appellant submits that questioning Detective Robinson regarding Appellant's "background" does not open the door to allowing testimony of prior search warrants that served as a basis for reversal. Previously, this Court stated that prior to introduction of this evidence, the State must show that it "can meet its heavy burden in this case showing that the probative value of evidence of the prior searches is not outweighed by the danger of unfair prejudice." (Vo. 1, p. 9). Even assuming *arguendo*, that the door was opened, the State and trial court were still bound to establish that the State could introduce this evidence and overcome the heavy burden of the fourth portion of 404(b). No

- 19 -

such hearing was conducted outside the jury. The State presented zero evidence regarding the probative value as it relates to the danger of unfair prejudice. The State simply disregarded this Court's ruling, tainted the trial, and thus must suffer the consequences on remand.

3. On redirect examination of Detective Robinson, and still prior to any 404(b) hearing, or proof regarding the probative value as opposed to propensity, the State began questioning regarding the previous search warrants. (Vol. V, pp. 193-94). The State asked Detective Robinson about a prior search warrant at Appellant's home.

    "Q – So, so this wasn't the first time you had gotten such a tip? A – No, Ma'am, it a – no, he wasn't new to me to and the operation wasn't new to me also. I just like to verify the information I'm given." Id. Again, the State could have avoided this area on redirect. However, it proceeded forward, without regard to this Court's ruling and directly solicited testimony of the prior search warrant.

4. The State *finally* requested the trial court addressed [sic] this Court's ruling after Appellant testified. (Vol. V, pp. 285-93)(emphasis added). Appellant submits that at this point reversible damage existed due to the State's questioning regarding the prior search warrants. The State sought to introduce evidence of the prior search warrants because Appellant denied having cocaine in his possession. However, the State had already solicited this testimony during its case in chief. The trial court acknowledged the jury "kind of knows about this prior incident already." (Vol. V, p. 290, Lines 21-23). The trial court addressed 404(b) and stated that "since he's opened the door to this and now put his intent and knowledge and all this stuff in issue for the first time" that the evidence would be admissible under 404(b). (Vol. V, p. 291, lines 13-16). Appellant strongly disagrees and submits the trial court's ruling is too little, too late. The evidence was allowed in previously and no ruling was mentioned.

5. On cross-examination of Appellant, the State questioned Appellant regarding the prior search warrants at his home. (Vol. V, p. 297-98; Vol. VI, pp. 307, 309-10, 312, 315). The State asked Appellant if officers came to his house on August 1, 2007. (Vol. VI, p. 307). On this occasion, the prosecutor elicited testimony regarding "a golf ball size rock of crack." (Vol. VI, p. 307). The State blundered on, next questioning Appellant about an August 19, 2007, incident. (Vol. VI, p. 309-10). The State brought up further questioning regarding Appellant's previous trial, stating that "actually in that trial your

defense attorney conceded that you had the cocaine," and Appellant "ran to the bathroom and (you) flushed it down the toilet, your defense attorney conceded that." (Vol. VI, p. 309, lines 6-11). No curative instruction [sic] given by the trial court to this line of question[ing] and there was no offering of probative value by the State. The State kept hammering away on Appellant, stating that "At least twice in the six months prior to them executing the search warrant at your house the Memphis Police Department found crack at your house." (Vol. VI, p. 312, lines 10-12). Appellant adamantly denied knowing of the cocaine or crack being present in his home on all occasions.

First, Defendant did not object to most of the testimony for which he complains was improperly elicited. The only time that Defendant objected was prior to the jury-out hearing that the trial court conducted at the State's request during Defendant's cross-examination. At that point, Defendant himself had already "opened the door" by asking Officer Robinson if he conducted a criminal background check on Defendant. The following exchange took place at trial during Defendant's cross-examination of Detective Robinson:

Q. Don't have the witness, don't have the audio and video. You did a background check on [Defendant]; right?

A. Uh-huh

Q. Okay. What did you find out about [Defendant] in the background check?

[PROSECUTOR]: Judge, may we approach?

THE COURT:     Sure.

*     *     *

[PROSECUTOR]: I'm happy for him to answer that question.

THE COURT:     All right, go ahead.

[PROSECUTOR]: Okay.

THE COURT:     He can go ahead and ask him. You can ask him the question.

- 21 -

[PROSECUTOR]: I don't think he wants him to.

\* \* \*

Q.   (BY [DEFENDANT]) What did you find out in your background check on [Defendant]?

A.   That we have previously did [sic] a search warrant at your house, [Defendant].  Your ties to the house as far as you being there and me seeing you come in and out of the location with a key, being there at different times of the day.

On redirect examination, the following exchange took place between Officer Robinson and the prosecutor:

Q.   So you got a tip from [a] confidential informant and instead of acting on that tip you went and double checked it?

A.   Yes, ma'am.

Q.   And you said in your testimony you had actually executed a search warrant at [Defendant's] house before?

A.   Yes, ma'am.

Q.   So, so this wasn't the first time you had gotten such a tip?

A.   No, ma'am, it a - - no, he wasn't new to me and the operation wasn't new to me also.  I just like to verify the information that I'm given.

On recross-examination, Defendant asked Officer Robinson additional questions about a previous search warrant:

Q.   You said that you were, you were familiar with [Defendant]?

A.   Yes, sir.

Q.   Through a previous case?

A.   Yes, sir.

Q.   On that previous case did you have a search warrant then?

- 22 -

A.    Yes, sir.

Q.    Was [Defendant] named on the search warrant?
A.    No, sir.

Q.    So your information, your previous involvement really didn't involve [Defendant], did it?

A.    Yes, sir, it did.

Q.    It did?

A.    Yes, sir.  On the previous search warrant at your house, if I can remember right, when we came into the house you then had hands on drugs at that time also.

Defendant did not object to the State's question to Officer Robinson as to how he knew Defendant nor did Defendant object to Officer Robinson's answers to Defendant's questions about his (Defendant's) background.  Defendant did not object to any further questioning of Officer Robinson by the State about prior searches of Defendant's house. It is a well-established rule that a defendant's failure to timely object and call this issue to the trial court's attention constitutes a waiver of appellate review of the issue.  *See* Tenn. R. App. P. 36(a); *State v. Hall*, 8 S.W.3d 593, 603 (Tenn. 1999); *State v. Thornton*, 10 S.W.2d 229, 234 (Tenn. Crim. App. 1999).  Defendant also failed to request a 404(b) hearing at that time.  While a trial court may sua sponte conduct a hearing, the language of the rule indicates that "the trial court was not obligated to conduct such a hearing absent a request."  *State v. Hall*, 958 S.W.2d 679, 707 (Tenn. 1997) (app'x); *see also State v. Jones*, 151 S.W.3d 494, 498 n.3 (Tenn. 2004) (declining to consider whether evidence should have been excluded pursuant to 404(b) when the defendant failed to request a 404(b) hearing).  As the defendant did not request a 404(b) hearing, the trial court was not obligated to conduct one.  Accordingly, this issue is waived.  We also decline plain error review.

As to the State's questioning of Defendant on cross-examination about the prior search warrants, Defendant opened the door to this testimony by asking Officer Robinson questions about Defendant's background.  It was not until the *State* requested a hearing during Defendant's cross-examination to "talk about the August 1st and the August 19 incidents where [Defendant] was found with crack cocaine" that Defendant finally objected.  However, at that point, the jury had already heard testimony about the prior searches, and Officer Robinson specifically testified that "if I can remember right, when we came into the house you then had hands on drugs at that time also."  Tenn. R. App. P. 36(a) states that no relief is required for "a party responsible for an error or who failed to

take whatever action was reasonably available to prevent or nullify the harmful effect of an error." *See also*, *State v. Frank H. Gonzales, Jr.*, No. M2000-03219-CCA-R3-CD, 2002 WL 31487520, at *2 (Tenn. Crim. App. Oct. 29, 2002)(Defendant opened the door to testimony regarding her motivation for cooperating with the police by raising the issue while questioning another witness).

Furthermore, we do not conclude that the State violated this court's instructions in the opinion of the prior appeal. Those directives clearly pertained only to a situation on retrial where Defendant did not open the door for admission of evidence of the prior searches. Defendant is not entitled to relief on this issue.

### III. Sentencing for Simple Possession of Marijuana

Defendant argues that his two-year sentence for simple possession of marijuana, third offense, a Class E felony, is illegal because "[o]n July 1, 2016, [the] Tennessee Legislature amended [T.C.A.] § 39-17-418 by removing the enhancement that made three or more convictions of misdemeanor possession casual exchange qualify for an enhancement from a class A misdemeanor to a class E felony. See Tenn. Code Ann. § 39-17-418, 2016, ch. 876, § 12." Even though the statute was in effect at the time Defendant committed the offenses in February of 2008 and at the time he was sentenced in January of 2016, Defendant argues that the amendment to the statute should be applied retrospectively. We disagree.

At the time of the offenses and the sentencing hearing in Defendant's case, Tennessee Code Annotated section 39-17-418 provided that "[i]t is an offense for a person to knowingly possess or casually exchange a controlled substance," and such a violation was a Class A misdemeanor. T.C.A. § 39-17-418(a),(c). Where the defendant had two or more prior convictions under section 39-17-418, the offense was a Class E felony. *Id.* § 39-17-418(e). Tennessee Code Annotated section 39-17-418(e) was amended effective July 1, 2016, to delete subsection (e) and substitute instead the following: "(e) A violation under this section is a Class E felony where the person has two (2) or more prior convictions under this section and the current violation involves a Schedule I controlled substance classified as heroin." 2016 Tenn. Pub. Acts, c. 876, § 12.

"[S]tatutes are presumed to apply prospectively in the absence of clear legislative intent to the contrary." *State v. Thompson*, 151 S.W.3d 434, 442 (Tenn. 2004) (citing *Van Tran v. State*, 66 S.W.3d 790, 797-98 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 735 (Tenn. 1998)). If the legislature intended the amendment to apply retroactively, it could have stated so. *See State v. Odom*, 137 S.W.3d 572, 582 (Tenn. 2004). In this case the legislature stated that the amendment at issue was to take effect on July 1, 2016. 2016 Tenn. Pub. Acts, c. 876, § 12. Because no legislative intent to the contrary is shown, we presume that the amended subsection (e) applies to offenses committed on or after July 1, 2016. Also, when a penal statute is amended by a subsequent legislative act,

an offense committed before the amendment "shall be prosecuted under the statute in effect at the time of the commission of the offense." T.C.A. § 39-11-112. Therefore, Defendant was properly sentenced to two years for third offense simple possession of marijuana, a Class E felony, in accordance with the statute that was in effect at the time of his offense.

## IV.    Improper Testimony by the State's Expert Witness

Defendant contends that the trial court erred by allowing the State's expert witness, Officer Michael Gibbs, to testify that Defendant "looks 'healthy,' and resembled a drug seller because he did not display any of the physical characteristics of a crack user."

The admissibility of expert testimony is governed by Rule 702 of the Tennessee Rules of Evidence. "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Our supreme court has further defined the role of the trial court in assessing the propriety of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

*State v. Scott*, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotation marks omitted).

Trial courts are vested with broad discretion in resolving questions regarding the admissibility of expert testimony. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). On appellate review, we will not disturb a trial court's decision regarding the admission or exclusion of expert testimony absent an abuse of discretion. *Scott*, 275 S.W.3d at 404. A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn.

2006)).  At trial, the burden rests on the party proffering the expert witness to establish that the evidence "rests upon 'good grounds.'"  *Scott*, 275 S.W.3d at 404.

Concerning the appearance of crack cocaine users and drug dealers, Officer Gibbs testified:

> You would see they - - the pipes get really hot.  You'd see what we call the ring from the glass or metal pipe.  You can't smoke it in plastic because you can't get it hot enough, well the plastic starts to melt so that's why they use glass pipes and or metal pipes.  They put Chore Boy in the end of it and they smoke and get a burn sometimes on their fingers, severe burns on their fingers and they get a, if their lips touch the pipe, they'll get a U shape.
>
> Crack users also it, as I say, it looks as if their losing like weight.  Those guys who are addicted to crack they start to change physical appearances.  You start to look like you're getting older and you could be, you know, a younger guy.  It takes, it takes away your youth.  It takes away your vitality.
>
> \*      \*      \*
>
> Drug dealers, I mean, they come in all shapes and sizes.  We've had an older lady who could have been my grandmother selling this stuff.  But they tend to be normal looking people.  Healthier people.  They don't have the char - - they don't have, like I said, the crack, the burnt lips, the fingers from where they've been holding the pipes.  So they more blend in with us or people who aren't on or addicted to crack.

When asked if Defendant displayed any of the characteristics of a crack cocaine user, Officer Gibbs replied: "He looks healthy to me."  Defendant objected, and the trial court overruled the objection.

Officer Gibbs' testimony was within his field of expertise, and Defendant has not shown that his testimony was improper nor was it prejudicial to Defendant.  Officer Gibbs was qualified, based on his training and experience, to look at Defendant and determine whether Defendant had the appearance of a crack cocaine user.  Defendant is not entitled to relief on this issue.

### V.      Prosecutorial Misconduct

For this issue, Defendant argues the following:

> The State Committed Prosecutorial Misconduct By Mentioning and Eliciting Testimony of Prior Searches and Search Warrant in its Case-In-Chief, Running Afoul With this Court's Ruling on Direct Appeal, by Using Improper Convictions to Impeach [Defendant], and During Its Closing Argument When it Told the Jury [Defendant] Was Simply Trying to Confuse the Jury.

(emphasis in original).

In *State v. Goltz,* 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003), this court outlined "five general areas of prosecutorial misconduct":

(1) intentionally misleading or misstating the evidence;

(2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;

(3) making statements calculated to inflame the passions or prejudices of the jury;

(4) injecting broader issues than the guilt or innocence of the accused; and

(5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." In connection with this issue, we must also examine the following factors:

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]

(2) the curative measures undertaken by the court and the prosecution[;]

(3) the intent of the prosecutor in making the statement[;]

(4) the cumulative effect of the improper conduct and any other errors in the record[; and]

(5) the relative strength or weakness of the case.

*State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)). Even if a prosecutor's comments, however, are found to be improper, whether the misconduct amounts to reversible error depends on whether the comments had a prejudicial effect on the jury. *State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999).

First, Defendant argues that the State committed prosecutorial misconduct by mentioning and eliciting testimony during its case-in-chief of prior searches executed at Defendant's house. However, as discussed earlier in this opinion, Defendant did not object to this testimony on the basis of relevance or on the basis of prosecutorial misconduct, and he elicited testimony of prior searches during his cross-examination of Officer Robinson. Therefore, this issue is waived. *See* Tenn. R. App. P. 36(a). We also decline to review this issue for plain error.

Next, Defendant contends that the State committed prosecutorial misconduct by using improper convictions to impeach him during cross-examination. During cross-examination, the State requested a jury-out hearing concerning this matter. The prosecutor stated: "I think he's [Defendant] pretty much kicked the door wide open for me to talk about some of the other incidents. The following exchange then took place:

> THE COURT: All right, [prosecutor], what is it you want to do?
>
> [PROSECUTOR]: Judge, I want to talk about the August 1st and the August 19 incidents where [Defendant] was found with crack cocaine. He said he hasn't had it since 1985. And he was found on two separate occasions and I would like to ask him about it.
>
> THE COURT: And the day of this incident, remind me.
>
> [PROSECUTOR]: It was February 29, 2008.
>
> THE COURT: And these happened August 1st.
>
> [PROSECUTOR]: August 1st and August 19th of 2007, in the same house, on the same street.
>
> THE COURT: She wants to ask you about that, what's your take on that, [Defendant]?
>
> [DEFENDANT]: She asked me had I smoked crack.

THE COURT: No, what - - she's wanting to introduce those, talk to you about those matters in front of the jury, is that okay with you or do you object to her?

[DEFENDANT]: I object to it. But I want to say this, though, your Honor, she asked me had I smoked - - the last time I smoked and I said 1985. That's what she asked me.

THE COURT: All right. Well, here's - - I'm going to let her ask. I think the door has been opened about this for multiple reasons. One thing, during the testimony of a prior witness, let's see, that was Kittrel Robinson, during the testimony Kittrel Robinson, Mr. Jones [sic], you asked me and elicited that he had previously done a search warrant at your house. And you also elicited from him that in a previous case you had drugs in your hands. All of which if you'd of had a lawyer may not of ever gotten in but you weren't smart enough to keep that part out. So you've already opened the door and now you claim that you - -

[DEFENDANT]: May I say something about that, your Honor?

THE COURT: No, not until I'm finished making my ruling and then I'll let you talk. But then here on cross-examination by the State, she's now claiming in addition to that you've opened [the] door by your claims with regard to not having any cocaine in your possession for a number of years. And then you generally denied that you had any knowledge that this cocaine was in your house. You don't contest the cocaine was in your house, do you?

[DEFENDANT]: No, sir, I never - -

THE COURT: But you're just claiming it's none of mine. I don't - -

[DEFENDANT]: It's not mine.

THE COURT: I don't have any kno - - I wasn't in on it. I don't have any guilty knowledge of it. You didn't even know it was there, did you?

[DEFENDANT]: Well, I probably knew it was there so.

THE COURT: Okay. Well then she'll ask you that when the jury comes back. But are you going to ask me to introduce 404(b) proof of this? Or just want to ask him about it?

- 29 -

[PROSECUTOR]: I just want to ask him about it right now, judge.

THE COURT:     Go ahead.

[PROSECUTOR]: After he's done testifying I may speak with Detective Robinson and put in the 404(b) proof.  But right now I just want to ask him about it.

THE COURT:     Well unless I know - - I believe he's opened the door but I also want to in my mind feel confident that if you wanted to put on proof of substantively about this that it would qualify under 404(b). Now in looking at this objectively under 404(b) we're talking about the evidence that within, what, six months, how many months was it?

[PROSECUTOR]: August to February, so roughly six months.

THE COURT:     About six months.  Within six months twice this house, which I think based upon your expert's testimony could pretty much be described as, what, a trap house?

[PROSECUTOR]: A trap house, yes.

THE COURT:     You know, within months [Defendant] is physically present when they have all this cocaine around.  And in one of the incidents he's flushing the cocaine down the toilet which, and by the way, he's convicted of that.  So talking about clear and convincing evidence.

[PROSECUTOR]: Judge, he's been convicted of the August 17th matter too, he's plead guilty.

THE COURT:     So he's been actually convicted of the August 1st and the August 17th, so that's clear and convincing evidence.

[PROSECUTOR]: He actually plead guilty to possession of cocaine which is direct, directly controverts what he's testified to today.

At conclusion of the hearing, the trial court made the following findings:

THE COURT:     Yeah.  Well, so, again, does - - is this relevant to something other than propensity and of course I think it would be relevant evidence as to his intent.  I think it's relevant to his guilty

knowledge. I think it's relative to his knowledge [,] intent. I mean you can't operate a trap house and then say all this stuff, I had no clue that these drugs are in my house. And so I think it relates to all of that.

I think this is significantly different than when this case previously went to the Court of Criminal Appeals because I - - for two reasons. I have not ruled prior to his testimony that this stuff comes in under 404(b). I gave him a chance to raise all of these issues in his testimony.

It's also significantly different because in the direct examinat[ion] - - I mean his cross-examination he opened [the door] to some of this stuff. So when you weigh probative value versus prejudicial effect, the jury kind of knows about this prior incident already, so that comes into play.

So I think looking at this under 404(b) that before I would allow any substantive evidence of this I would have to have a jury-out hearing, I'd have to find the evidence relevant to [a] material issue other than propensity and I've stated that those material issues are that I find evidence other than propensity. Must exclude evidence if the probative value is outweighed by the danger of unfair prejudice. And I have to find clear and convincing evidence.

I heard this proof in the prior trial and found clear and convincing evidence. He's since been convicted of both of these incidents which makes it clear and convincing evidence. And I only exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. And since he's opened the door to this and now has put his intent and knowledge and all this stuff in issue for the first time, I think that substantive evidence under 404(b) would be admissible and that this is distinctly different from what procedurally [ ] went up to the Court of Criminal Appeals before.

I will say this, that in the prior opinion of the Court of Criminal Appeals they quoted me in reversing me but didn't quote my entire paragraph. I said in with regard to intent that normally you don't just let in intent unless there's some prior similar connection. And I think that the same house here is involved in a relatively short period of time. This is sort of like the - - so I find connectedness here that makes this different from the normal case.

In the prior opinion in the Court of Criminal Appeals didn't think much of my connectedness analysis but this is somewhat like in the domestic violence incident. Prior crimes of acts of violence against the same

- 31 -

victim are admissible sometimes under 404(b), when if they were different victims it wouldn't .

So this is the same house. It's the same deal, so. With it being in this procedural different context with him having elicited this himself in part of his proof and with me not ruling prior to his testimony that this comes in but letting him put all these issues that I find it relevant an issue, first. I think that you could under 404(b) introduce this stuff.
So I'm not saying you're making that decision but before I allow cross-examination on any of this I just wanted to be sure in my mind that the substantive proof to back it up [sic] but also it be available. So I'm going to let you question him about - -

\*      \*      \*

- - those in the presence of the jury. We'll bring the jury back in.

Defendant contends that the State's use of prior convictions to impeach his credibility violates Tenn. R. Evid. 609 and amounts to prosecutorial misconduct. The admissibility of an accused's prior convictions is governed by Rule 609 of the Tennessee Rules of Evidence. Rule 609 permits the accused's credibility to be impeached by prior criminal convictions on cross-examination if certain conditions and procedures are satisfied. The conviction must be for a crime (1) punishable by death or incarceration in excess of one year, or (2) involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Generally, convictions that are ten years old or more cannot be used for purposes of impeachment. Tenn. R. Evid. 609(b). The State is also required to give reasonable written notice prior to trial of the particular convictions it intends to use to impeach the accused. Tenn. R. Evid. 609(a)(3).

Before permitting the use of a prior conviction, the trial court must find that the probative value of the conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. *Id.* The trial court shall rule on the admissibility of the prior conviction before the accused testifies. *Id.* If the court rules that the prior conviction is admissible to impeach, there is no requirement that the accused testify at trial in order to later challenge the court's ruling on the admissibility of the prior conviction. *Id.* The underlying facts of the conviction are inadmissible. *See Long v. State*, 607 S.W.2d 482, 485 (Tenn. Crim. App. 1980); *see also* Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 6.09[11][f] (4th ed.2000) (citing *Long* and stating that "[i]f a criminal conviction is used to impeach under Rule 609, counsel . . . is precluded from inquiring about the details of the offense"). A trial court's decision to admit evidence of prior convictions pursuant to Tennessee Rule of Evidence 609 is reviewed under an abuse of discretion standard. *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). A trial court abuses its discretion when it applies an incorrect legal standard or

reaches a decision that is against logic or reasoning that causes an injustice to the party complaining. *State v. Gomez*, 367 S.W.3d 237, 243 (Tenn. 2012).

In this case, it was not prosecutorial misconduct for the State to ask Defendant about his prior convictions because a jury-out hearing was held, and the trial court specifically found that the State could question Defendant about "the August 1st and the August 19 incidents where [Defendant] was found with crack cocaine." The trial court also found that the State could question Defendant about the prior searches, as substantive evidence, under Tenn. R. Evid. 404(b). Therefore, the State's questioning of Defendant on cross-examination concerning his prior convictions does not rise to the level of prosecutorial misconduct. Also, as we have previously addressed in this opinion, Defendant opened the door to this testimony during his questioning of Officer Robinson.

Furthermore, since the trial court mentioned this Court's analysis in the prior appeal, we take this opportunity to clarify that we explicitly reject this trial judge's analysis in the case *sub judice*. We conclude it was not error to admit the evidence, on the sole basis that Defendant opened the door for the proof to be admitted. There was more than "ample other non-prejudicial evidence available to the prosecution to prove the issue [of intent]," W. Mark Ward, *Tennessee Criminal Trial Practice* § 22:24, at 670 (2014-2015 ed.), and therefore absent Defendant's *pro se* missteps, the facts of the prior searches should not have been introduced as substantive evidence.

Finally, Defendant contends that the State committed prosecutorial misconduct in its closing argument by stating:

> At the end of this, [Defendant] is going to get up and talk to you. It's been said and I've heard it a number of times, I actually heard it from one of the most respected attorneys in this county, it was in my first jury trial, he said you know what they teach us at defendant attorney's school? If you can't convince them, confuse them. That's what [Defendant] is going to get up here and do. Don't get bogged down in what [Defendant] is going to get up here and say.

However, Defendant failed to object to the State's argument. Therefore, this issue is waived. *See* Tenn. R. App. P. 36(a). We also decline plain error review of this issue.

However, we do note that in the quoted argument, the prosecutor violated factor number (5) of *Goltz*, by intentionally arguing facts outside the record which are not matters of common public knowledge. We also observe, even though it is also waived as an issue by failure to object at trial and to argue it on appeal, that the prosecutor violated factor (2) of *Goltz*, expressing a personal belief of Defendant's guilt by stating the following during closing arguments:

The State has to prove beyond a reasonable doubt that [Defendant] possessed the cocaine. That it is cocaine. And that he had it with the intent to sell it and he had it with the intent to deliver it. *You know how I know* that he had it with the intent to sell it and he had it with the intent to deliver it? Not just because it's packaged up and ready to go, not just because it weighs almost eighteen times the legal weight or something. *I know because* remember what I told you, [Defendant] gets crack, people give him money and he gives it to them. *That's how I know*. [Defendant] is a drug dealer, that's the bottom line. That's what he was doing on February 29 of 2008.

\*      \*      \*

None of that is important. The State doesn't have to prove actual sale. The State had to prove with intent. This is his intent. His intent was to sell drugs. His intent was to put crack cocaine on the streets of Memphis, that was his intent. [Defendant] is a drug dealer. *You know how I know*? Because he told you. Thank you, ladies and gentlemen.

(emphasis added).

## VI.    Trial Court's Comments on Legality of the Search Warrant

Defendant contends that the trial court "committed reversible error by commenting on evidence in the jury's presence when it, on several occasions, told [Defendant] the search warrant underlying this case was legal."

The trial transcript reveals three occasions where the trial court told Defendant that it had already ruled that the search warrant was legal or valid. However, Defendant concedes that he failed to make a contemporaneous objection to any of the three comments about which he complains. Consequently, Defendant has waived this issue. *See* Tenn. R. App. P. 36(a)(providing that an appellate court need not grant relief where a party failed to take reasonably available action to prevent or nullify an error); *see also State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010).

## VII.    Cumulative Error

In his final issue, Defendant contends that each of the claims that he has raised "individually would warrant a new trial," but he argues additionally that "the cumulative effect of these errors warrant a reversal of [Defendant's] convictions." *See State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010) ("The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a

cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial"). Having found no error in the trial proceedings which were not waived by Defendant, we need not consider the cumulative effect of the alleged errors.

## CONCLUSION

We affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE